JS 44  (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Dhara Lalani

**(b)** County of Residence of First Listed Plaintiff   Lancaster, PA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Mark S. Scheffer, Law Offices of Mark S. Scheffer, P.O. Box 111, Birchrunville, PA 19421, 610-915-8351

## DEFENDANTS
Steinman Communications

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
         THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1  U.S. Government
       Plaintiff
- ✖ 3  Federal Question
       *(U.S. Government Not a Party)*
- ❏ 2  U.S. Government
       Defendant
- ❏ 4  Diversity
       *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - | ❏ 690 Other | ❏ 423 Withdrawal | ❏ 376 Qui Tam (31 USC |
| ❏ 130 Miller Act | ❏ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ❏ 140 Negotiable Instrument | Liability | ❏ 367 Health Care/ | | | ❏ 400 State Reapportionment |
| ❏ 150 Recovery of Overpayment | ❏ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' | Product Liability | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted | Liability | ❏ 368 Asbestos Personal | | ❏ 835 Patent - Abbreviated | ❏ 460 Deportation |
| Student Loans | ❏ 340 Marine | Injury Product | | New Drug Application | ❏ 470 Racketeer Influenced and |
| (Excludes Veterans) | ❏ 345 Marine Product | Liability | | ❏ 840 Trademark | Corrupt Organizations |
| ❏ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ❏ 480 Consumer Credit |
| of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | ❏ 710 Fair Labor Standards | ❏ 861 HIA (1395ff) | ❏ 490 Cable/Sat TV |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle | ❏ 371 Truth in Lending | Act | ❏ 862 Black Lung (923) | ❏ 850 Securities/Commodities/ |
| ❏ 190 Other Contract | Product Liability | ❏ 380 Other Personal | ❏ 720 Labor/Management | ❏ 863 DIWC/DIWW (405(g)) | Exchange |
| ❏ 195 Contract Product Liability | ❏ 360 Other Personal | Property Damage | Relations | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| ❏ 196 Franchise | Injury | ❏ 385 Property Damage | ❏ 740 Railway Labor Act | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| | ❏ 362 Personal Injury - | Product Liability | ❏ 751 Family and Medical | | ❏ 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | ❏ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | ❏ 791 Employee Retirement | ❏ 870 Taxes (U.S. Plaintiff | ❏ 896 Arbitration |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | Income Security Act | or Defendant) | ❏ 899 Administrative Procedure |
| ❏ 230 Rent Lease & Ejectment | ✖ 442 Employment | ❏ 510 Motions to Vacate | | ❏ 871 IRS—Third Party | Act/Review or Appeal of |
| ❏ 240 Torts to Land | ❏ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ❏ 245 Tort Product Liability | Accommodations | ❏ 530 General | | | ❏ 950 Constitutionality of |
| ❏ 290 All Other Real Property | ❏ 445 Amer. w/Disabilities - | ❏ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 446 Amer. w/Disabilities - | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration | | |
| | Other | ❏ 550 Civil Rights | Actions | | |
| | ❏ 448 Education | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ✖ 1  Original
       Proceeding
- ❏ 2  Removed from
       State Court
- ❏ 3  Remanded from
       Appellate Court
- ❏ 4  Reinstated or
       Reopened
- ❏ 5  Transferred from
       Another District
       *(specify)*
- ❏ 6  Multidistrict
       Litigation -
       Transfer
- ❏ 8  Multidistrict
       Litigation -
       Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. Section 2000e et seq.
Brief description of cause:
employment discrimination

## VII. REQUESTED IN COMPLAINT:
❏ CHECK IF THIS IS A **CLASS ACTION**
  UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ⬤ Yes   ◯ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE  2/07/2019

SIGNATURE OF ATTORNEY OF RECORD   *Mark S. Scheffer*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**   19   615

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

1147 Persimmon Drive, Lancaster, PA 17601
Address of Plaintiff: _____

8 West King St., Lancaster, PA 17603
Address of Defendant: _____

Lancaster, PA
Place of Accident, Incident or Transaction: _____

---

**RELATED CASE, IF ANY:**

Case Number: _____   Judge: _____   Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?  Yes ☐  No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?  Yes ☐  No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE  2/13/2019   _____   59271
                  *Attorney-at-Law / Pro Se Plaintiff*   *Attorney I D # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.  *Federal Question Cases:***

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☑ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
*(Please specify)*: _____

**B.  *Diversity Jurisdiction Cases:***

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify)*
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
*(Please specify)*: _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____Mark S. Scheffer_____, counsel of record *or* pro se plaintiff, do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☑ Relief other than monetary damages is sought.

FEB 11 2019

DATE  2/13/2019   _____   59271
                  *Attorney-at-Law / Pro Se Plaintiff*   *Attorney I D # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ 609 (5/2018)

**APPENDIX I**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

Dhara Lalani.                              :                CIVIL ACTION

                             v.            :

Steirman Communications                    :                NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a)  Habeas Corpus – Cases brought under 28 U.S.C. §2241 through §2255.                          (  )

(b)  Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits                               (  )

(c)  Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   (  )

(d)  Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                      (  )

(e)  Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)                                                                         (  )

(f) Standard Management – Cases that do not fall into any one of the other tracks.                 ✗

| | | |
|---|---|---|
| 2/07/2019 | Mark S. Schaffer | Mark S. Schaffer |
| **Date** | **Attorney-at-law** | **Attorney for Plaintiff** |
| 2/07/2019 | | Marksschaffer@gmail.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

Mark S. Scheffer, Esquire
LAW OFFICES OF MARK S. SCHEFFER
Identification Nos. 59271
P.O. Box 111                                          Attorney for Plaintiff
Birchrunville, PA 19421
(610) 915-8351

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DHARA LALANI | : | CIVIL ACTION |
| | : | |
| v. | : | NO. |
| | : | |
| STEINMAN COMMUNICATIONS | : | JURY TRIAL DEMANDED |

## COMPLAINT

1. Plaintiff, Dhara Lalani, is an individual residing in the Commonwealth of Pennsylvania at 1147 Persimmon Drive, Lancaster, PA 17603. Ms. Lalani is a dark-skinned female who came to this country from India in 2004.

2. Defendant, Steinman Communications, was Plaintiff's employer and has offices located at 8 West King Street, Lancaster, PA 17603.

3. The causes of action set forth in this complaint arise under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq*. ("Title VII"), The Civil Rights Act of 1866, as amended, 42 U.S.C. §1981 ("§1981") and The Pennsylvania Human Relations Act, 43 P.S. §951 et seq. ("the PHRA").

4. The District Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, 1343 and 1367.

5. At all times material hereto, Defendant acted through its authorized agents, servants, workers and/or employees acting in the scope of their employment with Defendant and in furtherance of Defendant's business.

## DHARA LALANI'S ORIGINAL COMPLAINT

6.     Plaintiff was hired by Defendant on or about October 12, 2015 in the position of Finance Director, and worked for Defendant until her termination on or about December 19, 2017.

7.     On or about May 18, 2018 Plaintiff filed a Charge of race, sex and national origin discrimination against Defendant ("Charge") with the United States Equal Employment Opportunity Commission ("EEOC"). The Charge is attached hereto as Exhibit A.

8.     Plaintiff's EEOC Charge was dual-filed with the Pennsylvania Human Relations Commission.

9.     In November of 2018 the EEOC mailed to Plaintiff a notice of dismissal and right to sue dated November 15, 2018.

10.    As alleged in the attached Charge, whose allegations are incorporated herein, Plaintiff was subjected to discrimination on the basis of her race, sex and/or national origin by Defendant as follows: a) in her initial hiring, compensation and the termination of her employment; b) by the disparate treatment she received from Defendant compared to her coworkers; and, c) through a hostile environment which included insensitive and crass comments.

11.    As indicated in the attached Charge, Plaintiff also alleges that Defendant engaged in a pattern of discriminatory behavior against other women who worked for the company.

12.    After Plaintiff filed her Charge with the EEOC, Defendant hired a white male, Paul Dydek, to head the Finance Department and take over Plaintiff's job functions. Mr. Dydek was given the title of Chief Financial Officer, a title denied to Plaintiff.

13.    As a direct and proximate result of Defendants' discriminatory and

2

**DHARA LALANI'S ORIGINAL COMPLAINT**

wrongful conduct, Plaintiff has in the past incurred, and may in the future incur, a loss of earnings, loss of earning capacity, loss of benefits, pain and suffering, upset, emotional anguish, loss of life's pleasures, attorneys' fees and costs.

## COUNT I (TITLE VII)

14.     Plaintiff hereby incorporates by reference Paragraphs 1 through 13 above as if set forth herein in their entirety.

15.     Defendant violated Title VII.

16.     As a direct and proximate result of Defendant's violation of Title VII, Plaintiff has sustained the losses and damages set forth above.

## COUNT II (§1981)

17.     Plaintiff incorporates herein by reference paragraphs 1 through 13 above as set forth herein in their entirety.

18.     Defendant violated §1981.

19.     As a direct and proximate result of Defendant's violation of §1981, Plaintiff has sustained the losses and damages set forth above.

## Count III (PHRA)

20.     Plaintiff incorporates herein by reference paragraphs 1 through 13 above as if set forth herein in their entirety.

21.     Defendant violated the PHRA.

22.     As a direct and proximate result of Defendant's violation of the PHRA, Plaintiff has sustained the injuries, damages and losses set forth herein.

3

**DHARA LALANI'S ORIGINAL COMPLAINT**

## RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendant:

(a)    Declaring Defendant's actions to be in violation of Title VII, §1981 and the PHRA;

(b)    Awarding Plaintiff reinstatement to her prior position with Defendant;

(c)    Awarding compensatory damages to Plaintiff to make Plaintiff whole for all lost earnings, past and future, which Plaintiff has suffered as a result of Defendant's improper and unlawful treatment, including, but not limited to, past and future wages, lost earning capacity, pension and other lost benefits;

(d)    Awarding compensatory damages to Plaintiff for emotional upset, mental anguish, humiliation, injury to reputation, loss of life's pleasures, and pain and suffering;

(e)    Awarding Plaintiff's costs of this action, together with reasonable attorney's fees; and,

(g)    Granting such other and further relief as the court deems appropriate.

Respectfully submitted,

Dated: **2/07/2019**

_____
Mark S. Scheffer, Esquire

4

**DHARA LALANI'S ORIGINAL COMPLAINT**

# Exhibit A

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented to: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ___ FEPA<br>_X_ EEOC | |

|  | **Pennsylvania Human Relations Commission** | and EEOC |
|---|---|---|
|  | State or local Agency, if any | |

| Name (indicate Mr. Ms. Mrs.)<br>**Dhara Lalani** | Home Phone (Incl. Area Code)<br>**(717) 892-6765** | Date of Birth |
|---|---|---|
| Street Address<br>**1147 Persimmon Drive** City, State and ZIP Code<br>**Lancaster, PA 17601** | | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name<br>**Steinman Communications** | No. Employees, Members<br>**501+** | Phone No. (Include Area Code)<br>**717-291-8811** |
|---|---|---|
| Street Address<br>**8 West King Street** City, State and ZIP Code<br>**Lancaster, PA 17603** | | |
| Name | No. Employees, Members | Phone No. (Include Area Code) |
| Street Address City, State and ZIP Code | | |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| _X_ RACE __ COLOR _X_ SEX __ RELIGION _X_ NATIONAL ORIGIN<br><br>__ RETALIATION __ AGE __ DISABILITY __ OTHER (Specify below.) | Earliest          Latest<br>**06-2017**      **12-19-2017**<br><br>_X_ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attached extra sheet(s)):

I.    I am a dark-skinned female who came to this country from India in 2004. I was hired as Finance Director on October 12, 2015. At the time of my hire, I reported to Kimberly Roerig, who had the title of Chief Financial Officer. Ms. Roering, a white female, had joined the company in approximately July of 2015. She reported to the Chief Executive Officer, Robert ("Bob") Krasne. In December of 2015 Ms. Roerig was abruptly terminated and Mr. Krasne spoke to me about taking charge of the Finance Department. I agreed to take that role but Mr. Krasne refused to give me the title of CFO (my title remained Finance Director) and refused to pay me at the same salary as Ms. Roerig, instead offering me a base salary paying $30,000 less a year with a quarterly bonus potential of another $30,000 per year (Ms. Roerig's base salary was $200,000 with a bonus potential of 20% of her salary). After Ms. Roerig was fired I replaced her on the Executive Team, which was comprised of 9 individuals, 7 of whom were male and 2 female (including myself). I was the only member of the team who was not white.

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY -- When necessary for State and Local Agency Requirements |
|---|---|

| I declare under penalty of perjury that the above is true and correct.<br><br>May 2nd, 2018    ~~Dhara Lhin~~<br>Date          Charging Party Signature | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLANANT<br><br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year) |
|---|---|

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented to: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ___ FEPA<br>X  EEOC | |

| Pennsylvania Human Relations Commission | and EEOC |
|---|---|
| *State or local Agency, if any* | |

THE PARTICULARS ARE (*If additional paper is needed, attached extra sheet(s)*):

II.     I was subjected to disparate treatment and a hostile environment by Mr. Krasne. In the late spring or summer of 2017 he began to treat me significantly different than other members of the Executive Team, e.g. as follows: a) he would deal directly with the male members of the team but would use the Executive VP, Ralph Martin, as a go-between and communicate with me mainly through Mr. Martin; b) he would bypass my authority and deal directly with my direct reports, thereby keeping me "out of the loop;" c) he failed to give me feedback on my work (and did not do any performance reviews of my work) and failed to communicate clear goals to me while engaging in detailed discussions with my peers on their performance and goals, and he also set unrealistic goals for me; d) he left me out of important meetings (while also cancelling individual conferences with me) and left me off of important projects, often including my reports in these meetings and involving them directly in the projects; and, e) he often ridiculed me and my performance at the weekly meetings he conducted with my peers and also at Board meetings (which drew comments from Board members about Mr. Krasne being a "bully" and not appreciating the magnitude of my work, and elicited comment about whether I had developed a "thick skin").

III.     Mr. Krasne also withheld my bonus for the second and third quarters of 2017 without justification. In the Fall of 2017 I was about to hire a female for the Controller position when Mr. Martin told me that if I hired an ex-male employee instead of the more qualified female then Mr. Krasne would pay my bonuses for the second and third quarter. I hired the male individual and was paid both bonuses, with Mr. Martin telling me that my hiring this male individual was "a change in direction that Bob wanted to see."

IV.     Approximately a week before I was terminated a white, male contractor was hired to do tasks that fell under my job responsibilities and capabilities (e.g., benchmarking and defining financial and operational metrics for the company's businesses).  I would later be told that I was losing my job because my position was being eliminated, yet I was never offered this consulting opportunity. Mr. Krasne also totally by-passed me again, removing

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLANANT |
| May 2nd, 2018    *[signature]*<br>Date            Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(*month, day, year*) |

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented to: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ___ FEPA<br>X  EEOC | |

Pennsylvania Human Relations Commission _____ and EEOC
*State or local Agency, if any*

from me any supervision of this contractor and appointing one of my direct reports, a white male, to work directly with him. This male contractor was given my office after I was fired.

V.   The disparate treatment I was accorded by Mr. Krasne as a female was consistent with his treatment of other women, for example Ms. Roerig, Kim Strong (former president of Steinman Marketing Solutions), Nancy Fisher (former Vice President of Finance and Administration), Barb Roda, Sally Balioni (former Director of National & Major Accounts), Sherri Sattler (ex-Director of Sales and Marketing), and Lauren Frick (Corporate Secretary), who were also either subjected to more exacting standards than male co-workers, subject to ridicule and criticism at meetings, ostracized and/or terminated after short periods of employment. Ms. Strong was terminated and replaced after less than a year working for Respondent by a male employee named John Walker and Ms. Roda was also replaced as Executive Editor by 2 male employees. Ms. Sattler was terminated without cause after about 8 months of employment, and Ms. Balioni was terminated without cause about 10 months after becoming employed, with her job being split between male employees. Ms. Roerig filed a charge of gender discrimination after her termination.

VI.   I was also subjected to insensitive and crass comments which reflected a discriminatory attitude towards women and towards my race and ethnicity as person from India. See attached documentation.

VII.   On December 19, 2017 I was terminated from my job when Mr. Martin informed me that Mr. Krasne had decided to "eliminate" my position.

IV.   I believe that I have been discriminated against because of my sex, race and/or national origin in violation of Title VII of the Civil Rights Act of 1964, as amended.

****See attached detailed documentation regarding the allegations summarized above ****

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY -- When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLANANT |
| May 2nd, 2018<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year) |

MEMO

Background –

1. I am a 37 year old female of Asian origin (Indian in particular). I have a Bachelors degree in Commerce from University of Mumbai and I am a Certified Public Accountant.

2. I was hired as Finance Director on 10.12.2015 at Steinman Communications with a base pay of $140K + 20% bonus potential based on company & individual performance. I reported to the CFO at the time. Her name was Kim Roerig. She was getting paid $200K + 20% bonus potential. Kim reported to the CEO of the organization whose name is Bob (Robert) Krasne. On 12.9.2015, Bob asked me to take charge of the Finance department, telling me in confidence that he would be letting Kim go. Kim had joined the organization in July 2015 and was fired in mid-December 2015. On 12.14.15, I agreed to lead the Finance department and it was announced to the group. He told me that he would compensate me accordingly for my elevated position and change my title. On 12.31.15, I asked him for his thoughts on my revised pay. I asked that I get compensated at the same rate as Kim i.e. a base pay of $200K + some bonus potential. He negotiated a base pay of $170K + $30K 'bonus' to be paid in 4 equal quarterly installments of $7.5K each. On that day (i.e. 12.31.15) I agreed and I asked him to put this negotiated pay in writing for HR records. He finally did so on 2.14.16, telling me all along that I should trust him. In his write-up, my $30K 'bonus' was contingent on me attaining goals that we would mutually agree upon sometime prior to the commencement of each quarter. Payment was to be made on the 1st pay period immediately following the end of the quarter. For the next 5 quarters, Bob approved my 'bonus' payout upon me just sending an email request to him every quarter. Please note that there were no goals set ever for me by Bob during my tenure with Steinman Communications.

3. In the summer of 2016, Kim filed a legal case against Bob on grounds of gender discrimination. The reason I know such details is because of the position I held at the organization and Bob shared a few details of the case with me in passing. It was also talked about at one of the quarterly Board meetings where I was in attendance.

4. Bob's Senior Executive Team ('SET') comprised of myself, 7 male Caucasians and 1 female Caucasian.

Particular instances of when I was treated 'differently/uniquely' by Bob for being a woman and a minority. This created a hostile work environment for me making it extremely hard for me to operate to the best of my ability & negatively impacted my morale and the morale of my team:-

1. Bob's demeanor with me was fair & professional from Dec 2015 all the way through the 2nd quarter of 2017. I had very good industry contacts and I hired 3 competent individuals from my previous company to join Steinman Communications. Such hires took place from December 2015 through November 2016. Bob saw a huge advantage in having me as a resource and thus maintained excellent relationship with me till the time I was pulling in the right people to join the company and training them for 4 months so that they would be fully productive in their roles. However, he did not honor my Q2 2017 'bonus' payments citing an error on a project as his reason. I proved that his assessment was wrong and he still would not pay my quarterly 'bonus'. I sent him several emails and raised the question several times when we met during our scheduled weekly meetings. He ignored all my requests and wrongfully denied my 'bonus' pay that I had earned. He also did not honor my Q3 2017 'bonus'. With all of his other direct reports, Bob would proactively communicate and reason out in detail the final determination of any bonus payouts (I have emails to support this). On 9.24.17, he handed over a paper to me outlining ambiguous & unrealistic goals for me to be achieved by 12.31.17 citing that he would like to combine my last 3 quarters of bonus pay to achievement of the goals. This was absolutely contrary to the compensation arrangement I had with him when taking up the role. Again, he handed over a paper to me vs. sending an email. When I asked him for

1

clarification on the goals repeatedly, he did not respond back (*I have emails to support this*). He never gave me the opportunity to sit down with him and discuss any of my concerns. Unlike his treatment with my other colleagues, who he would always make sure that they were comfortable with the expectations/goals (*I witnessed this repeatedly at the numerous budget meetings with various department leaders*); I was sidelined and poorly treated, fully knowing that my compensation was at stake.

2.  Bob cut-off off his communication with me to a large extent in the last 7 months of 2017, even though I was his direct report per HR files. He used the Executive Vice President – Ralph Martin to communicate on all important matters with me regarding my projects, HR matters, business decisions and opinions related to my work that Bob liked or disliked. Ralph also served as the lead HR person for the organization. Communicating through a middleman created a tremendous amount of mis-communication and left me second guessing on what was expected from me and when. That in turn, inhibited me from setting clear expectations for my team and I could not lead effectively. It left me feeling demotivated. More importantly, I felt like a 2nd class citizen in the organization when my direct supervisor did not bother to talk to me directly. It made it very difficult to operate at my 100% capacity.

3.  during the last 6 months, he cancelled majority of the standing weekly meetings with me. He would send Ralph to have conversations with me. Ralph would take notes and communicate back to Bob. This was never the case previously. Bob would actively communicate with me on all matters via email, Skype and phone.

4.  Bob went to my direct reports to discuss viewpoints on various projects and would not come over to my office even though I was seated 20 feet away from my team-mates (*e.g. rent exp allocation method for budget purposes, he went straight to Don*). With his other direct reports, Bob would discuss and engage them on all matters related to their respective groups.

5.  I was not included on meetings on several important projects (e.g. i) at the onset of the GL restructure project, he just included my subordinate who I hired and excluded me from the discussion, ii) my FP&A manager was invited to meetings on a year long project (*Project 2019, rate card revision, appointing Don as the person for work with the individual engaged to work as contractor—not getting my opinion on it*). I was completely blindsided and kept in the dark. It made it hard for me to manage workload of my direct reports. Bob would not do so with his other direct reports (*e.g. he always met with the CIO and included her in all meetings when her team members were involved on the project. Same thing with leaders of all other businesses – radio, weeklies, restaurant, lnp advertising, circulation etc*). He would discuss 'all' matters, big or small, related to their respective groups; with the department leaders (i.e. his direct reports) vs. bypassing them and going directly to their subordinates. When I would send emails just to Bob which would be a result of the work performed by my direct reports, he would in turn send it to my direct reports (e.g. email exchange on 12.19.17 on the impact of lowering the capitalization threshold - - I sent this email to bob, who in turn forwarded it to my 2 direct reports + Ralph. He did not copy me when he was forwarding the email to these 3 individuals) without copying me on it or informing me about it (*I have emails to support this*) in an attempt to go around me or do it behind my back. Another example is when Bob would get in touch with Crystal Moores (who was a Procurement specialist at the time, in my department and was helping out with some collections matters) on the status of some collections. He would then use that information to quiz / question me in our weekly meeting. My people were very loyal to me so they would let me know about any direct exchange they would have with bob. Bob's such tactics put me in a really tough spot and I was upset to find out that he would go behind my back to get more information when he could have just worked with me. More importantly, he used such information to quiz me.

6.  a week before I was let-go, Bob engaged a male contractor (who was a retired CFO of a company based in York, PA) to perform part of the duties that fell under my area of responsibility (e.g. benchmarking and defining financial + operational metrics for the company's businesses). On his first day at the job, Bob called a

meeting with this contractor & 3 key members of my team, along with Ralph & Shane. At that meeting Bob announced that he Shane and Ralph had made a decision that Don (my direct report will be the point person for this contractor on all matters). Such decision was made without any consultation with me. Again, my position as Head of Finance was diminished to nothing and my inputs were not taken into consideration. Also, I clearly had the skillset and the qualification to perform the tasks assigned to the contractor. Therefore, Bob could have easily asked me to carry on such tasks (in lieu of engaging a consultant) if the company was in dire needs cutting costs and thereby eliminating my position. But Bob decided to get rid of me and hire a male, Caucasian contractor when I could have done the job at a reduced pay (in fact consulting roles is what I'm looking for in my next professional move).

7.  He ridiculed me on a regular basis, in front of 2 other senior members of the team during our weekly meetings saying that the performance of the Finance group was dismal and he was at wits end or something along the lines of 'I cannot believe you did not think about this' or he would raise his voice with me (with his eyes wide open) in the presence of Shane & Ralph and say something like 'I had told you about it.' I have never witnessed him say derogatory things about the performance of these 2 individuals at such meetings. At such meetings, he would bang the desk, slam the door and raise his voice. Numerous times, at such meetings, I was a victim of unfounded performance criticism and overly harsh feedback. Bottom-line, I was treated worse than my co-workers. His tone would change from being harsh (while speaking to me) to gentle (while speaking to the other 2 members of the meeting), all within a span of 60 seconds. It was clear that he harbored a lot of negative sentiments against me. Again, I did not do anything different and I put in the same level of interest and hard work in my job as I did early on in my tenure with the company. Another instance of when Bob treated me differently is as follows: Hours before the start of the Q4 2017 board meeting in December 2017, Bob was upset about something and was quite vocal about it in his office such that the 2 admins sitting outside his office could hear him very well. Right at that time, Chris Schmidt (the Controller who re-joined the company) was in the vicinity & also heard Bob's temper tantrums. A few minutes after Chris left the vicinity of Bob's office & came down to his office, he got a call from Bob who apologized to him about his temper and specifically mentioned that it was not intended towards him. This entire incident was quoted to me by Chris & Jeff Hollinger (one of the admins who sits outside of Bob's office). Based on this incident, it was clear that Bob knew very well how to manipulate his temperament with different people and the fact that he specifically made sure that he did not offend a male employee in the organization with his tantrums is testament to the fact that he goes that extra mile for them. On the flipside, I have seen him publicly shame the female employees in the company (e.g. myself, Kim Roerig, Nancy Fisher, Barb Roda - - who used to be the Executive Editor, but was demoted and her position was taken up by 2 male colleagues).

8.  During my time at Steinman Communications, Bob neglected to do my performance review, making it impossible for me to know where I stood with expectations.

9.  I was defamed at the September 2017 Board meeting in front of all the Board members. Bob raised his voice and mentioned that he gets no help from the Finance team and it is dysfunctional group, pointing directly at me. He then left the room. At that time, Ralph mentioned to the Board that he is an extremely impatient man and that I have a skeletal crew to work with in accomplishing his lofty goals. Also, one of the Board members walked over to me after the meeting and shared her opinion of Bob being a bully and the fact that he does not understand and recognize the magnitude of work that I was undertaking. A month later, another Board member asked me if I had developed thick skin (for my survival at the organization) simply because he had witnessed what Bob had put me through at the Board meeting. In all the Board meetings I have attended, Bob has never ridiculed any other member of his team. In fact, I have always

witnessed him sing praises of his senior team. Again, I was singled out and publicly shamed.

10. On several occasions, I verbally raised my concerns with Ralph on i) Bob's lack of communication with me ii) making it hard for me to manage my group and expectations since I was always left to be second guessing iii) why I was treated differently from his other direct reports creating a very hostile work environment for me iv) unrealistic performance expectations for me v) being denied my contracted quarterly pay-out when I was diligently doing my job and nothing otherwise was communicated to me. Ralph's response to the first 4 points were 'this is how it is here and that's how Bob wants to lead. It is a family owned business, where things are not disciplined like it is in a public company. Unfortunately, I have no clout in such situations.' However, Ralph did help me in getting my Q2 2017 and Q3 2017 'bonus' approved by Bob. I was told by Ralph that if I hired an ex-male employee for the open Controller position in my group vs. the far more qualified female candidate that I had interviewed for the position, then Bob would approve my 2 quarterly 'bonus' payments. I did so and I got paid my $15K of 2 quarterly payments at the end of November 2017. Ralph mentioned that this is a 'change in direction' that Bob wants to see. I found this to be utterly ridiculous and a classic example of harassing me. I can guarantee that no one else in the organization was asked to make certain business moves in an effort to receive their 'earned' and 'contracted' paycheck.

11. On 12.19.17, I was told by Ralph that Bob has decided to eliminate my position (note that Bob did not communicate with me at all on this even though I was his direct report). On that day, Ralph gave me the severance paper-work. Ralph told me that Bob was not willing to give any severance money to me and that Ralph had to twist his arm to pay something. This was clearly discriminatory in nature since every person that had been let-go from the company got a severance payout. The severance paper-work has 6 weeks of severance + Q4 2017 'bonus' (which was characterized as 'deferred compensation' in the severance paperwork). Then and there, I asked Ralph if he would double it. Ralph checked with him and 5 minutes later he told me that he was okay with offering 12 weeks of severance + Q4 2017 deferred compensation. I was asked to strike out 6 weeks and put in 12 and then initial it. I asked Ralph why the quarterly 'bonus' was characterized as 'deferred compensation' and the answer that Ralph gave me was 'upon checking with the company's employment attorney, it was in the nature of 'deferred compensation' since there was a precedence of it being paid out every quarter with any goals being set by Bob. That made sense to me and along those lines, I asked Ralph to check with Bob on paying my Q4 2017 deferred compensation NOT as part of severance settlement but in the 1st paycheck following 12.31.17 (since I was on the payroll until 12.31.17 according to the severance paperwork). Ralph checked with Bob and he denied the payment. Once again, I was denied compensation that I had lawfully earned. Had it been Bob's other direct reports, they would not have to go through such rigmarole in getting their earned compensation.

12. In October 2017, Ralph shared with me in confidence that he had mentioned to the lead team member of the external audit firm of the company (Kreisher Miller) that 'Dhara was under a lot of duress as a result of Bob and everything she does is wrong in Bob's eyes'. Clearly, other people (like Ralph in this case) saw how I was mis-treated and took it to the extent of mentioning it to outside finance partners. Ralph felt sorry for me and is further testament to the fact that I was treated differently from others by Bob.

13. A few days after termination, I called Ralph on 12.29.17 and asked him why my Q42017 deferred payment was tied to severance. I was officially on the payroll until 12.31.17, therefore I should be paid the Q42017 deferred amount of $7500. I asked Ralph to pay out in the 1st paycycle of January, Ralph agreed that it was the right thing to do and was going to 'convince' bob. Bob refused. Again, another action where he denied me the pay that I had legally earned.

14. During the February 2017 meeting to review IT budgets, Bob mocked at me in front of other individuals (Ralph, Caroline, Stuart). He mentioned out load that he

4

wanted the financial reporting to be perfect and things should be ticked and tied every single time with no errors whatsoever. I told Bob that with the change in personnel and processes, things might not be perfect. Caroline felt sorry and said '*but in reality things do fall through the cracks and it will not be perfect all the time.*' In response to Caroline's comment, Bob mentioned, '*Oh come on Caroline, I was on a roll here and you just foiled it with your comment*'.

15.   In October 2017, Ralph had a conversation with Krasne on the status of payout of my Q22017 and Q32017 since I was chasing both Bob and Ralph on this matter for months. Right after the conversation, Ralph came down to my office and said 'you are very young and very attractive.' (In response to that I said 'ok, I know that').

16.   I have always had the tendency to take off my high-heeled shoes in meetings. Ralph noticed that and mentioned 'I have always noticed with all the women I have worked, that the first thing that comes off are the shoes'. Ralph has made this comment multiple times in Bob's presence. I found this comment to be highly offensive, sexist and unprofessional. Bob, as the leader of the company, never said a word ever correcting him, which in turn proved that he perhaps saw nothing wrong with this and in fact supported such behavior.

17.   In Q1 2017, Bob forwarded an email to Ralph and me from the President (Deepa Balepur) of the Indian Organization of Lancaster County. Deepa was asking Bob for sponsorship money from Steinman Communications. Bob asked me and Ralph to come up with a decision on sponsorship. Ralph came over to my office and asked, 'So do you know this lady?' I said 'yes, I have known her for a while but it might not make business sense for the company to sponsor since the event is not well attended. And Bob was there at the event last year so he knows that it is not a huge turnout to justify the $10K sponsorship amount.' In response to this, Ralph said, 'is this woman (Deepa) a charming lady?' I questioned, 'how does that matter? She is definitely business savvy.' Ralph quickly realized what he had just said and answered, 'I mean business charming? Perhaps that's why Bob wants to consider sponsorship.' I found such line of thoughts utterly disgusting where business decisions were being made by Bob/Ralph based on physical traits of female individuals in society vs. focusing on business objectives of the organization. It really makes it a very uncomfortable place for female leaders to work.

18.   Don Leininger (FP&A manager in my group who reported to me) started dating Crystal Moores (a Procurement specialist at the time and who also worked in my group). To this Ralph made a comment to him, 'At least you got the good one. You could be stuck with something worst.' Both Stuart and I witnessed Ralph making this comment. One more time, I feel Ralph had made very many inappropriate comments on the physical traits & looks of female employees in the organization, making it a sexist culture to work in for female employees. Based on the frequency and the pervasive nature of comments, it is obvious to me that he repeated such remarks in Bob's presence who perhaps supported such behavior.

19.   In Q2 2017, Ralph mentioned to me that Bob had agreed to give Don a $5K discretionary bonus. It was something that I had recommended to Ralph, who talked to Bob on getting the approval. Being Don's direct supervisor, I communicated & congratulated him about this payout soon after it was approved. The next day, Ralph asked me if I had informed Don about it. I said, 'yes, *I did tell him about it. Why, wasn't I supposed to?*' Ralph said, '*Bob was saying that she (i.e. me) doesn't really wait too long.*' I asked Ralph, '*what's the reason for waiting. It was approved and as his direct supervisor, it is my duty & privilege to let him know.*' To this, Ralph's response was, '*I think he wanted to communicate it to Don himself.*' I was perplexed and asked Ralph, '*but I'm his supervisor. Throughout my career, I have always communicated performance related matters to my direct reports without the intervention of my boss. Not sure why it would be different here.*' Ralph's response was, '*I don't know. I cannot answer that for you. That's how Bob is.*' In other words, Bob did not recognize me as the leader of the finance department & wanted to go around me in communicating with my direct

reports on performance-related matters as well. This was completely contrary to his behavior with his other direct reports on similar matters.

20.     In may 2017, at the Lancaster Chamber Dinner, Bob made a comment to his friend (who is the CEO of the local waste management company) with a smirk and awkward expression on his face *'..and this is my CFO'*. I attended this annual dinner with my husband. My husband witnessed his facial expression and asked me why he referred to me as his CFO, when he has not conferred that title upon me. This is another example of Bob treating me poorly even to outsiders & not addressing me in my true capacity, using titles that he pleases appropriate to the situation, since the company really does not have anyone with a CFO title. He could have addressed me as 'Finance Director who leads all financial operations of the organization.'

21.     I have a tooth that is towards the inside and it is quite prominent when I smile. In January 2017, in Stuart's office, Bob made fun of my tooth, while having a business-related discussion. He did so by pointing his finger to his mouth. He did this in front of Stuart & me not knowing that I saw it from the corner of my eye. I found this to be very insulting to make fun of someone's physical characteristics, but I rubbed it off and kept my mouth shut.

22.     Bob really didn't want to pay me the market rate for the role that he elevated me to. Therefore, he used all excuses to not make the payment. Here's how I concluded that he didn't want to pay me -: Ralph mentioned this to me in November 2017, *'I told Bob that you need to pay her what you negotiated with her and you have to either treat her / see her as the leader of the finance department or this cannot work. Bob told me that he was desperate for someone to lead the finance group at the time he elevated your level and fired the CFO (i.e. Kim Roerig). So he really gave you what you wanted by splitting the $170K that would be paid during the course of the year via the biweekly payroll and the remainder $30K in 4 equal quarterly installments. You wanted $200K in total and he didn't want to pay you that much, so he used this mechanism of splitting your total package between the $170K of bi-weekly pay & the remainder $30K in 4 quarterly equal instalments.'*

23.     Another instance when I noticed that Bob was discriminatory when paying my quarterly negotiated deferred pay, is as follows: in any given quarter, Bob never initiated an email communication or a verbal communication on the quarterly payout amount during my tenure with Steinman Communications. I was the one to bring it up every quarter on the flip side, Ralph mentioned to me in January 2017 that Bob was asking him how much bonus was he supposed to be paid as part of his employment letter. Note that Ralph Martin's pay package consisted of a base pay of $375K + 10% bonus. Also, with one of his other direct reports – Jeff Boden (the President of the radio station operations); Bob would go back and forth with him over email giving him detailed answers on why he earned or did not earn various components of his bonus payout *(I have a copy of this email)*. On the contrary, with me, Bob deliberately failed to address any of my concerns on the quarterly bonus payouts when I raised such queries with him repeatedly. He clearly treated me differently as compared to my male counterparts.

24.     In week 2 of joining the company in October 2015, Bob walked into my office and started talking to me about the different businesses the organization was in and what he wanted to see done from a financial analysis stand point. I asked several questions and demonstrated a high level of intellectual curiosity. He then left. The finance admin at the time (Linda) was cross training with another admin (Lisa Hoffman), to enable Lisa to take up the role of Bob's admin. They were doing this training right outside Bob's office. When Bob was walking into his office, he mentioned to both Lisa and Linda about me, 'I just met the new girl and I fed her line'. Linda & Lisa found this very demeaning and confidentially told me, *'you really come across as a very smart person. Lisa and I both think so. However, just wanted to let you know that Bob just made a comment about you by telling us that 'he fed your line. Not sure why he said that, but just wanted to make you aware of it.'* I didn't know the meaning of the phrase 'fed your line'. Linda explained to me that it meant spoon feeding someone who is incapable of using

his/her own intelligence. In other words, Bob clearly thought that my intelligence levels were far below par. Again, he had no basis to make that assessment since I was with the organization for barely 2 weeks. The only reason, I could think he said it is because I'm a woman & that's how he perhaps thinks about all women. Never had I heard him say so about any other male hires.

I truly feel that Bob crossed the line into unlawful territory and created a hostile work environment for me. I base this comment since his outbursts were accompanied with the following three criteria:
- I was the only woman & minority (i.e. of Indian origin) on his team.
- Bob's behavior with me in the last 8 months of employment was so extreme that it changed the terms and conditions of my employment and it adversely impacted my ability to lead the department effectively.
- I had complained about the situation several times, but nothing was done.

I truly believe that Bob is a sexist who targets women and is discriminatory in nature. Here are particular instances to prove it:

1. On 12.9.2015, when I was in a meeting with him, I received a work-related email from Nancy Fisher who was the VP of Finance and Administration at the time. I shared my computer with him to show him the contents of the email. In there was Nancy's signature at the bottom of the email. He took my computer and changed her signature to say 'Empress of Administration'. He further said to me that her email is so long and the content is so irrelevant that his lips hurt reading through it. Bottom-line, he was belittling Nancy in front of me. Note that the person 2nd in command in the Finance department was never ridiculed. In fact he is the person who I was forced into hiring in the Controller position (as a condition to getting my 2 quarters of deferred compensation payout).

2. I was told by Nancy that Bob and 2 of his male direct reports called themselves 'Ruling Hoontas'. It was a term coined by Bob in particular for the leaders of the company's bigger businesses.

3. In early 2016, he referred to an ex-female member of the HR team as 'Miss Giggles'. I personally witnessed him addressing her that way, several times.

4. In October 2015, I attended a budget-discussion meeting where there were 5 members of the Finance team (including Nancy and Kim) along with leaders of the various businesses. At that meeting, Bob called out, embarassed and slammed the Finance team in a high pitched voice. He particularly targeted Kim (who was the CFO at the time). Nancy broke down in tears at the meeting and a female Sr. Accountant left the room. I have not witnessed Bob treat any male employee of the organization so poorly in meetings.

5. I was not allowed to hire a female candidate for the important role of a Controller in the finance department.

6. Kim Roerig - the ex-CFO (also a female) was fired for no cause within 6 months of employment.

7. Kim Strong – the ex-president of Steinman Marketing Solutions ('SMS' - - this used to be the digital arm of LNP Media group) left the company in 11 months (she was there from April 2014 through Feb 2015 i.e. before I joined Steinman Communications). Based on my conversations with Nancy Fisher at the time, I was told that Bob gave her a really hard time and the 2 did not get along. Her role was taken over by a male - John Walker who joined the company in June 2014. John is still employed with the company & came in through a reference from Shane Zimmerman. As mentioned earlier, Shane & Bob are hands in glove with each other and Shane would not talk a word against Bob or contradict any of his views. I have also witnessed Shane bashing the previous CFO – Kim Roerig calling her 'crazy' and 'completely lacking sense of priority'. Also, based on Kim Strong's

LinkedIn profile, she has had longer employment periods with her other employers, which goes to prove that she was not treated appropriately by Bob, forcing her to leave. Based on this link, she moved to Lancaster for the role at Steinman Communications -

http://www.yorkblog.com/ydrinsider/2015/03/30/kim-strong-returns-to-york-daily-record-flipsidepa-among-first-projects/

8.     Sherri Sattler - the ex-director of Sales and Marketing (also a female) was terminated for no cause within 8 months of employment. She had a tough time working with the leader (a male named John Derr) of the advertising department (who Bob vehemently protects and praises publicly). Sherri had worked with her one of her previous employers for 27 years and based on my conversation with her & Ralph, had never been fired from her job during her 35 year career. Ralph knew Sherri from his previous role and had recommended Sherri for the role at Steinman. He was very disheartened to learn when Bob decided to terminate Sherri, especially so since Sherri relocated from another State for this role at Steinman Communications.

9.     Sally Balioni - the ex-director of National & Major accounts (also a female) was terminated for no cause within 10 months of employment. Her job was split between her boss (a male named John Derr---mentioned above in point #8) and another male colleague (Mark Rossman). John Derr leads the advertising department at the company's flagship product i.e. LNP, the daily newspaper. His sales numbers have been falling drastically and there has been a precipitous decline in the performance of his team over the last several years. Ralph had mentioned to me that John's leadership skills and sales skills are extremely poor in comparison to what he had seen in other newspapers across the country during his 40 year career. A family board member & the largest single shareholder in the company – Ms. Beverly Steinman expressed her lack of confidence in John Derr's skills to Ralph by pulling him aside during the break session at one of the 2017 board meetings. I was right there and I overheard the conversation where Peggy mentioned, 'If you have to let John go, then I will fully support that. I think he is giving away the paper and is the main cause of the decline in the paper's financial performance'. Ralph then relayed the conversation to me in confidence after meeting that Beverly fully supported ousting John Derr from his current role. Despite knowing all of John's shortcomings and being told so multiple times (by Ralph & based on the results of the 'sales assessment' performed by an external qualified assessor – Scott Fiorre from the company TriStarr (which is based in Lancaster); Bob constantly supported John Derr and over the years has instead ousted either his female colleagues or his female direct reports.

10.    Barb Roda - - who used to be the Executive Editor & had worked Steinman Communications for 35 years, was demoted due to poor performance. Her position was taken up by 2 internal male colleagues.

11.    Linda was the finance admin when I joined the organization in Oct 2015. She had joined the company less than 6 months before I joined as Bob Krasne's admin. For some reason, Bob did not like her and she was told to become the admin to the CFO (Kim Roerig at the time) and serve the Finance department. In December 2015, Linda was let go for no cause. She was told that her position was being eliminated.

12.    With all of the short-term employment tenures of female employees in positions of power/authority; it suggests that Bob is biased towards their male counterparts.

13.    Lauren Frick, Corporate Secretary confidentially mentioned to me in Q2 2017 that during her initial time with the organization, Bob would not talk to her directly on any and all matters that she was working on, even though their offices are 20 feet apart on the same floor. He would communicate with Shane Zimmerman, SVP & Treasurer; who in turn would communicate Bob's message to Lauren. I asked Lauren why Bob

would do that and she was unaware of any concrete reason. According to her, his behavior made no sense to her.

14.    Bob mentioned in a meeting, attended by Ralph and Don, 'the collections analyst cannot even spell my name right' To this Ralph said, 'What? She spelt Bob wrong?' Ralph, Bob & Don laughed at this. I was told so by Don Leininger. Don is an employee that I hired base don my work experience with him at a previous employer. So, I do have him as a witness to this incident.

15.    Stuart is another employee that I hired base don my work experience with him at a previous employer. Stuart was told during the interview process by Bob, 'Stuart, I just wanted to interview you so as to make sure that you are not a boob'. Stuart told me and Don about this almost a year after being with the company. Stuart is no longer with Steinman Communications. In my opinion, such demeaning remarks on female genital organs is absolutely unacceptable in the workplace and make it very uncomfortable for female employees to operate.

16.    As mentioned above, Linda was the finance admin when I joined the organization in Oct 2015. She had joined the company less than 6 months before I joined as Bob Krasne's admin. For some reason, Bob did not like her and she was told to become the admin to the CFO (Kim Roerig at the time) and serve the Finance department. In October 2015, Bob went and approached Lisa Hoffman, (who was relatively new to the company and was working as the receptionist in the lobby) to take over the role as his admin. Lisa agreed. However, in December 2015, Linda was let go for no cause. She was told that her position was being eliminated.

17.    In 2016, when Bob, Stuart, Shane and myself were in a meeting preparing for the Board meeting, I suggested to Bob that we should distribute all Board material electronically (vs. printing out the material & snail mailing the same). I further suggested that we could perhaps give each Board member a dedicated laptop that can be used to receive the material and view the same at the Board meeting. In response to this, Bob said, 'Carrie's son would use that laptop to watch porn in the basement.' Carrie Hill is a board member and Bob's wife's first cousin. She has one son who at the time would live with her (I'm not sure about his residential status right now). In addition to Carrie, the other board members were as follows:

    a) Bob's wife – Hale Krasne,

    b) Bob's wife's aunt (who never married and had no kids. She is in her 80s – Beverly Steinman),

    c) Joe Truncale – he is an outside Board member who resides in NJ and works in NY. He has one son.

    d) William (Bill) Beakley - he is an outside Board member who resides in TX. He has several grown-up kids.

    My point here is, Bob does not mock fun at the kids of the board members mentioned in c) & d) above, particularly since they male members. Secondly, early on in my employment at Steinman Communications, I had asked Bob about the professional bandwidth of the board members, to which he answered 'the only ones that add any value are Joe and Bill. Carrie asks some silly questions occasionally that are meaningless most of the times.' Again, I found this completely contrary to my experience with Carrie's intelligence level at the board meetings, where I noticed that she had a very high level of intellectual curiosity, asked very relevant questions, appropriately challenged the management at every meeting and showed great interest in understanding the financials. This was further proven by the fact that she particularly asked me to print the financial results that my group would prepare for the board meetings, in bigger font so that she could easily read it. Ralph too, based on his conversations with me, told me that 'Carrie is not as stupid as Bob thinks. She is quite intelligent and she sits on a few boards in the county. She does raise good points.'

Again, Bob acted sexist and tried to prove that a female board member can add no value.

I have also been a victim of racial slurs during my tenure at Steinman Communications. Below are specific examples:

1. in the summer of 2016, I was in Bob's office along with Shane when Bob was showing me pictures of the rituals that he and his wife performed on the banks of the Holy Ganges River for flowing the ashes of his mother-in-law. He mentioned to me that it was her last wish. In response to this, Shane mentioned laughingly, 'wow, so she had a nice rice river cruise.' Both men had a hearty laugh. This incident was thoroughly demeaning to me and my culture. Being a follower of the Hindu religion, we worship the Holy River Ganges and all rituals performed in the river are considered extremely sacred. For my religion and my religious beliefs to be belittled by 2 men of authority in the organization that I serve was utterly insulting for me. (Also, ever since joined the organization, I had noticed that Bob had a statue of a Hindu deity in his office. I wondered why. I never saw him worship it ever. Perhaps he had it as an artifact.)

2.	In the summer of 2017, when I asked Ralph whether we should approach Bob on reconsidering his decision to restructuring the general ledger, Ralph responded back saying, 'young lady, *__in this country__* we say that the horse has left the barn. I would just move forward with it.' He really made me feel that I was an alien from another country who really did not fit well into the corporate American culture. I was a direct insult on my heritage and where I came from indicating that individuals from my country were outsiders i.e. lack of diversity and inclusion at Steinman Communications.

3. a week after my departure from the company, I called up Ralph to let him know how upset I was with the way I was treated by Bob over the last 7 to 8 months. At that time, I asked him to get me a full year's worth of severance I compensation for the emotional stress I had to go through in dealing with the hostile work environment and for being treated differently. In response to this , Ralph mentioned, *'it is sometimes a risky proposition being in a senior position & reporting to a 1 person head. And while I understand and agree that you were treated poorly and differently, it is not uncommon in this country for such things to happen'*. He made me feel one more time that I was an alien in this country who did not know the 'rules of the land' and did not fit well with the American corporate culture, when he used the words, '*__in this country__*.'--------\*\*\*\*

Documentation of my conversation with Ralph on my last day (12.19.17) in the parking lot as he was walking me out of the office:

Ralph mentioned, 'I don't want to persuade your decision on any action you take, but just be aware that as friend, I would like to let you know that your future employer might think twice before hiring you should you be embroiled in litigation with your former employer.' I asked Ralph, 'how would the future employer know? It is not public knowledge.' Ralph responded, 'people find out and you might be asked to disclose it voluntarily. I'm just saying, if I were you I would just take the money and move on. You have great skills and a very impressive personality. You should definitely find a job where the environment for which you are better suited. This place is just different'.